IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

PITTENGER V. METROPOLITAN ENTERTAINMENT

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KATHRYN PITTENGER AND ROBERT PITTENGER, APPELLANTS,

V.

METROPOLITAN ENTERTAINMENT & CONVENTION AUTHORITY
AND MIDWEST MAINTENANCE COMPANY, INC., APPELLEES.

Filed November 17, 2020.    No. A-20-072.

Appeal from the District Court for Douglas County: JAMES M. MASTELLER, Judge. Affirmed.

Susan K. Sapp and Nathan D. Clark, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., for appellants.

Christopher J. Tjaden, of Evans & Dixon, L.L.C., for appellee Metropolitan Entertainment & Convention Authority.

David L. Welch, of Pansing, Hogan, Ernst & Bachman, L.L.P., for appellee Midwest Maintenance Company, Inc.

BISHOP, ARTERBURN, and WELCH, Judges.

BISHOP, Judge.

## INTRODUCTION

Kathryn Pittenger was injured when she slipped and fell on the arena floor while attending a concert at the CenturyLink Center Omaha (Center). She and her husband, Robert Pittenger, sued the Metropolitan Entertainment & Convention Authority (MECA), which leases and operates the Center, and Midwest Maintenance Company, Inc. (MMC), which provides janitorial and maintenance services for the Center under a contract with MECA. The Douglas County District

Court entered summary judgment in favor of MECA and MMC, and the Pittengers now appeal. We affirm.

## BACKGROUND

On November 17, 2016, the Pittengers attended a music concert at the Center. The weather and ground outside the facility had been dry that day. The Pittengers arrived between 6:45 p.m. and 7 p.m., before the concert began, and found their seats on the arena floor. When the Pittengers entered the concert area, the arena floor was fully lit. Kathryn testified that as she and Robert made their way to their row of folding chairs, she noticed an usher employed by MECA, Janet Henderson, standing near the entrance to their row. There was also a couple seated together at the end of the row where the Pittengers entered. Their row of seats was wide, and Kathryn estimated it to be "3 to 5 feet across." The Pittengers testified that they came into the row in single file next to the seats in front of their row, with Kathryn behind Robert, and their seats were "6-8 seats into the row." The two of them sat in their seats for approximately 10 minutes before getting up, wanting to get drinks and use the restrooms before the concert began. During that 10 minutes when the Pittengers were seated, no other person entered or exited the row. Only the Pittengers and the other couple were in the row, and the other couple remained seated.

The Pittengers made to leave their row the same direction they entered. The arena floor was still fully lit as they left their seats. Both Robert and Kathryn testified that they walked back toward the aisle with Kathryn following just behind Robert to his left. Robert walked close to the seats in front of their row, while Kathryn walked closer to the seats in their own row. As they walked, Kathryn did not look down and kept looking straight ahead of her. Just as they were in front of the couple at the end of the row and about to exit, Kathryn's left foot slipped and she fell on the polished concrete floor, ending up in a front-to-back splits position. Henderson, still nearby, came over immediately and asked Kathryn if she was okay, saying that she saw Kathryn's fall. At the time she saw Kathryn on the floor, Henderson was walking back from seating someone. Kathryn, Robert, and Henderson all testified that they did not see a puddle on the floor prior to Kathryn's fall. After her fall, Kathryn noticed a puddle of liquid on the floor, which she estimated to be about 8 inches across, that was "clear, sticky, and cold," and located approximately 6 inches into their row. Neither Kathryn, Robert, nor Henderson could recall whether or not the other couple at the end of the row had beverages, and the couple did not say anything about a spill or puddle to either Kathryn, Robert, or Henderson.

Robert assisted Kathryn back to their seats, as both of her legs were in pain and her "left knee . . . and left ankle [were] not supporting" her. The Pittengers stayed for the concert because the venue had begun to fill up and the lights were beginning to dim. Following the concert's conclusion, Kathryn still could not walk and required a wheelchair to leave the Center. Kathryn later underwent surgery to repair the meniscus tears in both of her knees and the torn ACL in her left leg that she suffered as a result of her fall.

The Pittengers filed a complaint on July 19, 2018, alleging negligence on the part of MECA and MMC. They asserted the puddle was the cause of Kathryn's fall and subsequent injuries, that MECA and MMC knew or should have known the puddle existed, and that they failed to exercise reasonable care to protect Kathryn from the danger presented by the puddle.

Following discovery, MECA and MMC each filed a motion for summary judgment against the Pittengers' claims. The district court entered an order on November 4, 2019, sustaining both motions, determining there was no genuine issue of material fact concerning whether MECA and MMC were on constructive notice of the puddle's existence. The court noted that "[e]ach of the witnesses testified that they did not observe the liquid prior to Kathryn falling. None of the witnesses remember whether or not the other couple had liquids." The court pointed out the following deposition testimony from Kathryn regarding her knowledge of the spilled liquid before her fall; she responded as follows:

Q [attorney for MECA]: Do you know now as you sit here today, do you have any evidence to show us that that liquid was there when you entered the aisle?

A [by Kathryn]: No, I have no evidence.

Q: Do you know at which point in time that liquid may have found its way onto that floor?

A: No, I didn't know it was there.

Q: Do you have any way of knowing when it may have found its way to the floor?

A: No. I didn't -- I -- when -- I didn't -- wasn't aware it was there until after I fell.

Q: And you don't know how it got there?

A: No.

Q: You don't know when it got there?

A: No.

Q: All you know is that when you were exiting . . . the row ten minutes after you got there, there was liquid?

A: Yes.

The district court also set forth some deposition testimony from Robert regarding his knowledge of the spilled liquid; he responded as follows:

Q [attorney for MECA]: Okay. And how long was the liquid on the floor prior to the incident happening?

A [by Robert]: I can't -- I cannot discern that.

Q: Do you have any evidence suggesting how that could have been discerned by Ms. Henderson?

A: No.

Q: How did the liquid get there?

A: I don't know.

Q: Do you have any evidence that suggests how Ms. Henderson could have determined how it got there or when it got there?

A: No.

Q: At any point in time in that evening, whether you're just getting into the arena, just getting to the arena floor, leaving to go meet your friends afterwards, at any point in time did you -- do you recall seeing any liquid on the floor?

A: At that location?

Q: Anywhere in the arena floor?

A: Not that I recall.

During her deposition, Henderson was also asked about her knowledge of the spilled liquid; she responded as follows:

> Q [attorney for Pittengers]: Okay. Did you see the spilled liquid before Ms. Pittenger fell?
>
> . . . .
>
> A [by Henderson]: No, I did not.
>
> Q: Okay. Did you see liquid on the floor when she fell?
>
> A: No.
>
> Q: Okay. Did you see a wet spot on her jeans?
>
> A: No.
>
> Q: Okay. Did you notice anything that she had slipped on?
>
> A: No.
>
> Q: Okay, do you definitively not remember seeing that, or do you just simply not recall because it was so long ago?
>
> . . . .
>
> A: No, I -- no, I don't remember seeing anything on the floor or on her pants.
>
> Q: Okay. Do you remember having looked closely at that area?
>
> A: No.

The district court found there was "no evidence establishing the origin of the spilled liquid or its duration, and there [was] no evidence from which an inference about the origin or duration of the spilled liquid could be made." After setting forth a thorough analysis of various cases dealing with hazardous conditions, the court determined that no evidence could sustain an inference about the puddle's origin or duration of existence. The court stated that "a fact finder would have to guess or speculate whether the liquid was on the floor for a sufficient length of time to put [MECA and MMC] on constructive notice of the hazardous condition." The court concluded that the Pittengers "failed to produce any evidence from which a reasonable inference could be drawn that [MECA and MMC] knew or by the exercise of reasonable care should have known of the liquid on the floor[,]" and therefore the Pittengers failed to meet their "burden to produce admissible contradictory evidence showing the existence of a material issue of fact that prevents judgment as a matter of law." While MMC asserted at the hearing on the motions for summary judgment that it owed no duty to Kathryn at the time of her injury, the district court found it unnecessary to reach the issue since it had already determined MMC's motion for summary judgment should be granted for the reasons already discussed.

The Pittengers appeal from the November 4, 2019, summary judgment order.

ASSIGNMENT OF ERROR

The Pittengers contend the district court erred in granting MECA's and MMC's motions for summary judgment on the basis that the evidence in the record was insufficient to create a genuine issue of material fact concerning whether MECA and MMC were on constructive notice of the puddle's existence.

STANDARD OF REVIEW

In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence. *Sundermann v. Hy-Vee*, 306 Neb. 749, 947 N.W.2d 492 (2020).

An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Id.* In the summary judgment context, a fact is material only if it would affect the outcome of the case. *Pitts v. Genie Indus.*, 302 Neb. 88, 921 N.W.2d 597 (2019).

ANALYSIS

A party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that it is entitled to judgment as a matter of law. *Wynne v. Menard, Inc.*, 299 Neb. 710, 910 N.W.2d 96 (2018). If the movant meets this burden, then the nonmovant must show the existence of a material issue of fact that prevents judgment as a matter of law. *Id.* When the parties' evidence would support reasonable, contrary inferences on the issue for which a movant seeks summary judgment, it is an inappropriate remedy. *Id.* Where reasonable minds could draw different conclusions from the facts presented, such presents a triable issue of material fact. *Id.*

The Pittengers argue that "[t]he evidence established a basis for a reasonable inference that the puddle of liquid was in existence for a definite period of time" and "Henderson's presence in the vicinity of the condition shortly before and at the time of the accident creates a triable issue of fact." Brief for appellant at 12.

We begin with identifying the five elements of premises liability for negligence. In premises liability cases, an owner or occupier is subject to liability for injury to a lawful visitor resulting from a condition on the owner or occupier's premises if the lawful visitor proves (1) that the owner or occupier either created the condition, knew of the condition, or by exercise of reasonable care would have discovered the condition; (2) that the owner or occupier should have realized the condition involved an unreasonable risk of harm to the lawful visitor; (3) that the owner or occupier should have expected that the visitor either would not discover or realize the danger or would fail to protect himself or herself against the danger; (4) that the owner or occupier failed to use reasonable care to protect the visitor against the danger; and (5) that the condition was a proximate cause of damage to the visitor. *Edwards v. Hy-Vee*, 294 Neb. 237, 883 N.W.2d 40 (2016).

The Pittengers state that the only issue on appeal is whether the record supports a reasonable inference that "the puddle existed for a length of time sufficient to put [MECA and MMC] on constructive notice." Brief for appellant at 12. Constructive knowledge is generally defined as knowledge that one using reasonable care or diligence should have. *Edwards v. Hy-Vee, supra.* In order for a defendant to have constructive notice of a condition, the condition must be visible and apparent and it must exist for a sufficient length of time prior to an accident to permit a defendant or the defendant's employees to discover and remedy it. *Id.* In the absence of evidence to support an inference of an owner or occupier's actual or constructive knowledge of the

hazardous condition, the Nebraska Supreme Court has refused to allow the jury to speculate as to the owner's or occupier's negligence. See *id*.

For purposes of summary judgment, we view the evidence in the light most favorable to the Pittengers and give them the benefit of all reasonable inferences deducible from the evidence. The Pittengers argue that the record as described above sufficiently supports a reasonable inference that the puddle existed for a sufficient time to put MECA and MMC on constructive notice. In support of their argument, the Pittengers direct us to primarily two cases: *Range v. Abbott Sports Complex*, 269 Neb. 281, 691 N.W.2d 525 (2005), and *Schade v. County of Cheyenne*, 254 Neb. 228, 575 N.W.2d 622 (1998).

In *Range v. Abbott Sports Complex, supra*, the Nebraska Supreme Court reversed the trial court's grant of summary judgment against a plaintiff who had tripped on a small hole in a soccer field during the last 5 minutes of a 90-minute soccer game. The plaintiff described the hole as small and appearing to have been made by a small burrowing animal, although he noted that grass was growing around the hole and there was no fresh or loose dirt around the hole. The court noted that the plaintiff's description of the hole supported a reasonable inference that the hole existed prior to the match's beginning when the referees inspected the field. As a result, the court concluded that a genuine issue of material fact existed concerning whether the defendants had constructive knowledge of the hole.

Similarly, the Nebraska Supreme Court determined in *Schade v. County of Cheyenne, supra*, that summary judgment was inappropriate against a plaintiff who sustained an injury to her wrist and thumb after she slipped on a puddle of water while walking down the hall in the Cheyenne County Courthouse. The evidence offered to the trial court included the testimony of a maintenance worker who characterized such a puddle as easy to see and indicated that, while in the vicinity of the puddle approximately 2 minutes before the plaintiff's fall, he saw no water on the floor. Witnesses testified to seeing the maintenance worker walk through the area where the plaintiff fell just a couple minutes prior to the fall. The Supreme Court stated that based on the maintenance worker's testimony, a fact finder could infer that the water was easy to see and that the maintenance worker was in the area in which the accident occurred anywhere from 2 to 15 minutes prior to the fall. The court further noted that the maintenance worker was in the area when the dangerous condition was present, and that if the maintenance worker had looked, the water would have been visible, apparent, discovered, and remedied. As the court explained:

> The conflicting inferences are that the water existed at the same time the maintenance worker was in the area and he should have discovered and remedied a condition he characterized as easy to spot or that the water was not present at the time the maintenance worker was in the area and he could not discover and remedy the condition - that is, the water accumulated between the time the maintenance worker left the area and the time [the plaintiff] slipped and fell.

*Id*. at 231, 575 N.W.2d at 624. In light of these conflicting inferences, the court deemed summary judgment inappropriate.

The Pittengers contend that these cases are directly applicable and require our reversal of the district court's grant of summary judgment. They argue the facts previously described would, akin to the facts in *Range v. Abbott Sports Complex, supra*, permit a trier of fact "to infer: (1) the

condition did not come into existence after the Pittengers entered their row; (2) the condition therefore came into existence before they entered their row; and (3) the condition existed from the time they entered the row until the accident." Brief for appellant at 15-16. In a similar vein, they also argue that *Schade v. County of Cheyenne, supra*, compels our reversal of the district court's summary judgment order because Henderson's presence in the vicinity of the puddle and Kathryn's fall was sufficient to support a reasonable inference that MECA and MMC had constructive notice of the puddle's existence.

However, we agree with the district court in this case that the evidence offered by the Pittengers cannot support a reasonable inference that the puddle existed for a sufficient time to put MECA or MMC on constructive notice. We note that in *Range v. Abbott Sports Complex, supra*, the plaintiff described the hole such that a fact finder could derive a reasonable inference, rather than mere speculation, of the hole's origin and duration to find that the defendants had constructive knowledge of its existence. In *Range*, the court noted that the plaintiff's description of the hole supported a reasonable inference that the hole existed prior to the match's beginning when the referees inspected the field. The injury occurred during the last 5 minutes of a 90-minute soccer game. In contrast, the facts identified by the Pittengers and described above do not offer indicia of the puddle's origin or duration to support a reasonable inference the puddle existed for a sufficient time to establish constructive notice. Neither Kathryn, Robert, nor Henderson saw or stepped in any puddle prior to Kathryn's fall nor could any of them recall whether or not the other couple at the end of the row had beverages.

The Pittengers present no evidence similar to the plaintiff's testimony in *Range v. Abbott Sports Complex, supra*, describing the grass and undisturbed dirt around the hole he tripped on that lends support to a reasonable inference of the specific timeframe of the puddle's origin and duration. Rather, the evidence before us supports only the broad notion that the puddle came into being at some point prior to Kathryn's fall. Any inference concerning the puddle's specific duration derived from the facts described above would be mere speculation with only guesswork or conjecture as its basis. See *Swoboda v. Mercer Mgmt. Co.*, 251 Neb. 347, 557 N.W.2d 629 (1997) (evidence that left jury with prospect of guesswork between at least two different possibilities was not sufficient to allow case to proceed to jury; evidence related to fall insufficient to establish reasonable inference of constructive knowledge of hazardous condition).

We are also not persuaded that the reasoning underlying the Nebraska Supreme Court's decision in *Schade v. County of Cheyenne, supra*, is apposite to this case. The maintenance worker in *Schade* testified that he was in the vicinity of the spill just before the accident occurred and the spill would have been easy for him to spot. Notably, the fall occurred in the hallway of building. After the fall, a 6- to 8-inch puddle remained on the floor. In that case, there was evidence that if the maintenance worker had looked, the water would have been visible, apparent, discovered, and remedied. In contrast, the Pittengers can only point toward Henderson's presence in the vicinity of the Pittengers' row prior to and at the time of Kathryn's fall and her orientation towards the Pittengers' row. But as noted by MECA, there was no evidence in the present matter that the puddle was easily visible. As MECA points out, even Robert, a former usher himself, "acknowledged the apparent invisibility of the puddle." Brief for appellee MECA at 11. In his deposition, Robert testified in response to questions as follows:

Q [attorney for MECA]: Do you have any information, knowledge, evidence to suggest that anybody from MECA or from Midwest knew the spill was there at the time of the incident?

A [by Robert]: I do not because even on top of it, I didn't see it.

Q: And by saying, even on top of it you didn't see it, you mean you walked right over it before --

A: I didn't see it.

Q: But you walked right across the area?

A: I must have walked over, but I didn't see it.

Accordingly, while the evidence adduced supports the notion that Henderson was in proximity to the area of Kathryn's accident before and at the time of her fall, this mere proximity and orientation together with the facts outlined previously do not support a reasonable inference that the puddle was visible to Henderson or that it existed for a sufficient time for purposes of constructive notice. As previously described, these facts only indicate that the puddle came into existence at some point before Kathryn slipped, and such a broad timeframe only permits a fact finder to speculate as to whether or not the puddle existed for a sufficient time to put MECA or MMC on constructive notice of the puddle's existence. As we have noted, such speculation does not create a genuine issue of material fact. See *Edwards v. Hy-Vee*, 294 Neb. 237, 883 N.W.2d 40 (2016) (in absence of evidence to support inference of owner or occupier's actual or constructive knowledge of hazardous condition, Nebraska Supreme Court refused to allow jury to speculate as to owner's or occupier's negligence).

In summary, the evidence before us would force a fact finder to merely speculate as to the origin and duration of the puddle in order to determine whether MECA or MMC were on constructive notice of the puddle's existence, and any inference based upon such speculation does not create a genuine issue of material fact. See *Edwards v. Hy-Vee, supra* (customer injured from fall after slipping on piece of watermelon, but no evidence as to how long watermelon was on floor; summary judgment appropriate because to have constructive notice of condition it must be visible, apparent, and exist for sufficient length of time to permit discovery and remedy). See, also, *Herrera v. Fleming Cos.*, 265 Neb. 118, 665 N.W.2d 378 (2003) (plaintiff slipped and fell on water when entering restroom in grocery store, but no one knew how long water had been on floor; summary judgment affirmed because facts insufficient to establish inference of constructive knowledge of hazardous condition).

CONCLUSION

For the foregoing reasons, we agree with the district court that no evidence supported a reasonable inference that the puddle existed for a sufficient length of time to put MECA or MMC on constructive notice. We therefore affirm the district court's order granting summary judgment in favor of MECA and MMC.

AFFIRMED.