Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/27/2021 08:08 AM CDT

Jeremy Hinson and Kelsie Hinson, husband
and wife, appellants, v. Cindy Forehead
and Ambassador Real Estate Company,
a Nebraska corporation, doing
business as Berkshire Hathaway
Home Services Ambassador
Real Estate, appellees.

___ N.W.2d ___

Filed July 20, 2021.    No. A-20-370.

1. **Summary Judgment: Appeal and Error.** In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence. An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.
2. **Statutes: Appeal and Error.** Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.
3. **Summary Judgment.** In the summary judgment context, a fact is material only if it would affect the outcome of the case.
4. **Statutes.** A statute's meaning is determined based on its text, context, and structure.
5. **Statutes: Appeal and Error.** Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words that are plain, direct, and unambiguous.

6. **Statutes: Legislature: Intent.** The court, in discerning the meaning of a statute, should determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense.

7. **Real Estate: Licensee: Agents.** A licensee acting as a seller's agent is required to provide to a buyer or prospective buyer written disclosure of adverse material facts actually known by the licensee under Neb. Rev. Stat. § 76-2417(3)(a) (Reissue 2018).

8. **Contracts: Real Estate: Words and Phrases.** Adverse material facts under Neb. Rev. Stat. § 76-2403 (Reissue 2018) include any fact which significantly affects the desirability or value of the property to a party and is not reasonably ascertainable or known to that party, and which may include, but is not limited to, a fact pertaining to any environmental hazards affecting the property required by law to be disclosed, the physical condition of the property, any material defects in the property, any material defects in the title, or any material limitation on the client's ability to perform under the terms of the contract.

9. **Real Estate: Licensee: Agents: Statutes.** The duty of a licensee acting as a seller's agent to disclose adverse material facts to a buyer or prospective buyer pertaining to a property is not limited to circumstances when the licensee has actual knowledge of a material defect or that the home needs extensive repair. Rather, the statutes contemplate whether the licensee knew of any facts which significantly affected the desirability or value of the property and which were not reasonably ascertainable or known by the buyer or prospective buyer, pertaining to the physical condition of the property or any material defects in the property.

10. **Summary Judgment: Testimony.** When the testimony of the parties is in conflict and credibility is a factor, summary judgment is not proper.

11. **Appeal and Error.** An appellate court will not consider an issue on appeal that was not passed upon by the trial court.

Appeal from the District Court for Douglas County: W. Russell Bowie III, Judge. Reversed and remanded for further proceedings.

Andrew M. Hollingsead, Michael J. Matukewicz, and Hattie K. Miller of Liakos & Matukewicz, L.L.C., for appellants.

Dan H. Ketcham and Alexander D. Struck, of Engles, Ketcham, Olson & Keith, P.C., for appellees.

Riedmann, Bishop, and Welch, Judges.

Bishop, Judge.

## I. INTRODUCTION

Jeremy Hinson and Kelsie Hinson purchased a home from Michael Bean and Deborah Bean in February 2018. The Hinsons subsequently filed a complaint against the Beans and several other defendants in the Douglas County District Court alleging the existence of significant structural issues related to the property which they claimed the defendants failed to disclose to the Hinsons. Following a stipulated dismissal of the Hinsons' claims against some defendants, the district court granted summary judgment in favor of the remaining defendants, Cindy Forehead and Ambassador Real Estate Company, doing business as Berkshire Hathaway Home Services Ambassador Real Estate (Ambassador), which the Hinsons now appeal. We reverse the judgment and remand the cause for further proceedings.

## II. BACKGROUND

During 2017, the Beans placed their home on the market and made efforts to sell the property. In October 2017, after several unsuccessful listings, Michael contacted Forehead, a licensed real estate broker affiliated with Ambassador, hoping to hire her to act as the sellers' limited agent for the sale of the home. Forehead met with Michael at the Beans' home later in October to discuss the hiring, and she was also given a tour of the property during this meeting. On November 18, the Beans and Forehead, acting on behalf of Ambassador, entered into a "Listing Contract" appointing Forehead as the Beans' agent in the listing and sale of their home. The listing contract also set the listing price for the property at $469,500. Forehead provided to Michael an "Agency Disclosure Information for Buyers and Sellers" form which listed the legal duties she and Ambassador owed to the Beans as sellers and to prospective buyers, including the duty to "disclose to a buyer otherwise undisclosed adverse material facts about the property." The

Beans also completed and provided to Forehead a "Seller Property Condition Disclosure Statement" (disclosure statement) that, in pertinent part, affirmed there were neither "any structural problems with the structures on the real property" nor "any moving or settling of" foundation, floor, or wall.

On November 29, 2017, Forehead listed the house for sale and made it available for potential buyers to tour. Forehead received several survey responses and other communications from potential buyers, some of which contained concerns about the condition of the Beans' home, including some regarding the property's foundation. On December 6, a potential buyer, Beau Starkel, requested through his agent, Melissa Boldt, permission to have an inspection of the home done prior to placing an offer, and the Beans allowed the inspection. Starkel thereafter hired a company named "RamJack" to inspect the Beans' property. After giving Starkel permission to conduct an inspection, Michael provided Forehead with a report from an inspection conducted in May 2017 by Foundation-2-Rooftop, Inc. On December 14, Boldt sent an email containing the RamJack inspection report, estimate, and other accompanying documents to Forehead following the completion of the inspection. The report identified, in pertinent part, signs of interior water intrusion, mold, and problems with the home's foundation. While Forehead confirmed that she received the email containing the documents, she claimed she did not open the email or review any of the attached documents. On January 4, 2018, Boldt contacted Forehead with an offer of $300,000 for the Beans' home, referencing that Starkel was "willing to take on the work that they feel needs to be done to the property" that included "the foundation work, replacing the rotted windows, and fixing damaged drywall due to water damage." Forehead presented this offer to the Beans, and it was rejected without further negotiation.

On January 6, 2018, the Hinsons entered into a purchase agreement with the Beans to purchase the property for $462,500. The Beans had provided the Hinsons with a copy of

the disclosure statement. On January 10, prior to closing, the Hinsons hired Complete Inspection Services, LLC, to perform an inspection of the home. The report given to the Hinsons after the inspection noted, in pertinent part, "[e]vidence of cracking . . . on right exterior of home, efflorescence noted on front block wall in mechanical room" and recommended "further review by qualified contractor for any repairs necessary." Based on this recommendation, the Hinsons hired Bruce Harris, an engineer affiliated with e.Construct, USA-LLC (e.Construct), to assess the home's foundation. Harris' report noted several issues, but concluded that "[n]othing discussed . . . would indicate that there are significant structural issues or damage to the residence." The Hinsons and the Beans agreed to several addendums to the purchase agreement addressing final concerns in the property, including mold remediation and other maintenance work required before closing. The Hinsons and the Beans agreed to remove an addendum that included the Hinsons' requests for permission to remove drywall covering a "foundation crack on the south wall" of the property in order to caulk that crack and to seal the "south wall exposed foundation . . . with waterproof sealant." The Hinsons' purchase of the property closed on February 12. After closing, Starkel came to the home and informed the Hinsons of the inspection report provided by RamJack that indicated structural defects in the home's foundation.

On July 24, 2018, the Hinsons filed a complaint in the district court against the Beans, Forehead, Ambassador, Harris, and e.Construct. They alleged six theories of recovery, including fraudulent and negligent misrepresentation, fraudulent concealment, violations of Neb. Rev. Stat. § 76-2,120 (Reissue 2018), breach of fiduciary duties, and negligence. The Hinsons sought damages of at least $82,325 and other relief. Throughout the remainder of 2018 and into 2019, the Hinsons had additional inspections done to assess the nature and extent of the defects, and the Hinsons received additional estimates for the cost of necessary repairs.

On December 2, 2019, the district court entered an order dismissing with prejudice the Hinsons' claims against the Beans, Harris, and e.Construct pursuant to the Hinsons' stipulation and agreement to dismiss the claims against those defendants.

Subsequently, Forehead and Ambassador jointly filed a motion for summary judgment, followed by a motion for summary judgment filed by the Hinsons. In considering the cross-motions for summary judgment, the district court entered an order on April 30, 2020, granting summary judgment in favor of Forehead and Ambassador. The court initially noted that the "central issue before the Court is whether Forehead had knowledge of an adverse material condition." It then addressed whether there was a violation of Neb. Rev. Stat. § 76-2417(3)(a) (Reissue 2018). It stated that for a seller's agent to be liable for the failure to disclose adverse material facts to a buyer under § 76-2417(3)(a), "an agent must have actual knowledge of a material defect" in the real property. The court determined that Forehead did not breach her duty as the Beans' agent to the Hinsons as prospective buyers, because she "did not have actual knowledge of a material defect" in the Beans' home. The court referenced Forehead's statement that she had not opened the email from Boldt containing the RamJack documents and had not opened the attached documents.

The district court further stated that "even if an agent is not required to have actual knowledge of a material defect, the information presented to Forehead would not have caused her to believe that such a defect existed." The court decided that the "*concerns*" raised by other potential buyers about "settling and potential problems with the foundation . . . did not amount to *facts* indicating that there were major structural issues that would need to be addressed." (Emphasis in original.) Identifying the numerous inspections that conflicted with one another and Forehead's testimony that she only reviewed the report provided to her by Michael, the court determined that "[a] difference of opinion [among inspection reports] does not amount to *actual knowledge of facts* that would cause a

reasonably prudent person to believe that a material defect existed." (Emphasis in original.) The court thereafter found that because "Forehead did not have knowledge of an adverse material fact, she did not breach the only duty she owed to the Hinsons under the circumstances" and granted summary judgment in favor of Forehead and Ambassador "as to the Hinsons' claim for violation of §76-2417."

The district court also granted summary judgment in favor of Forehead and Ambassador on the Hinsons' claim that Forehead and Ambassador violated § 76-2,120 by having knowledge of an error, inaccuracy, or omission in the Beans' disclosure statement concerning a structural defect actually known by the Beans. The court cited to its previous analysis of Forehead's lack of actual knowledge and further concluded there was "no evidence that the Beans *actually knew* that the foundation was in need of extensive repair." (Emphasis in original.) The court reasoned that since Forehead and the Beans lacked any knowledge of errors in the Beans' written disclosures, neither Forehead nor Ambassador could be held liable for any such error in the written disclosures.

Finally, in considering claims of negligence and breach of fiduciary duty, the district court concluded that the "only duty owed to the Hinsons by Forehead under the circumstances was to disclose adverse material facts that she actually knew of" and that she did not breach this duty, "because she did not have *knowledge* of the extent of repairs needed to fix the foundation." (Emphasis in original.) The court went on to state, "Indeed, there appears to be a difference of opinion even among the experts as to the nature and extent of repairs needed." The court concluded that since Forehead did not have knowledge of an adverse material fact, "she did not breach the only duty she owed to the Hinsons," and that therefore, Forehead and Ambassador were entitled to judgment as a matter of law as to the Hinsons' claims of negligence and breach of fiduciary duty.

In its April 30, 2020, "Order on Cross Motions for Summary Judgment," the district court sustained Forehead's and Ambassador's motion for summary judgment and overruled the Hinsons' motion for summary judgment. The case was dismissed with prejudice. The Hinsons timely filed this appeal.

## III. ASSIGNMENT OF ERROR

On appeal, the Hinsons claim the district court erred in granting summary judgment in favor of Forehead and Ambassador on the Hinsons' claim that Forehead and Ambassador breached § 76-2417(3)(a) by failing to disclose to the Hinsons adverse material facts actually known by Forehead and Ambassador.

## IV. STANDARD OF REVIEW

[1] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence. *Sundermann v. Hy-Vee*, 306 Neb. 749, 947 N.W.2d 492 (2020). An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Id.*

[2] Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *Chaney v. Evnen*, 307 Neb. 512, 949 N.W.2d 761 (2020).

## V. ANALYSIS

The Hinsons claim the district court erred in granting summary judgment in favor of Forehead and Ambassador because the evidence presented, when construed in the light most favorable to the Hinsons and affording the Hinsons all reasonable inferences deducible from the evidence, created a

genuine issue of fact as to Forehead's actual knowledge of adverse material facts pertaining to the physical condition of the property or any material defects in the property. Their assignment of error challenges only that portion of the district court's decision related to the Hinsons' claim against Forehead and Ambassador under § 76-2417(3)(a); we limit our review accordingly. We will first set forth the evidence in the record related to Forehead's knowledge and then consider the evidence under the summary judgment standard.

## 1. ALLEGED FACTS RELATED TO FOREHEAD'S KNOWLEDGE

### (a) Forehead's Communications With Boldt

As noted previously, Forehead engaged in correspondence with Boldt, who had acted as Starkel's agent in probing a prospective purchase of the Beans' home. On December 6, 2017, Forehead spoke with Boldt over the phone. Forehead testified at her deposition that during this conversation, Boldt informed her that Starkel was interested in putting in an offer, but that he knew "there [was] some work that needs to be done, and his main concern [was] the foundation, and [he] wants to make sure there [was] no water damage mainly to the northeast corner of the house." Boldt then asked Forehead whether the Beans would permit Starkel to have an inspection done on the house. In an email sent to Michael on December 6, Forehead relayed the request to have an inspection done, noting again the concern regarding the foundation and water damage while also stating that Boldt's was "the second request that [she has] had from an agent that wants to take someone in to look at the foundation and water issues." Michael consented to the inspection. On December 14, Boldt called Forehead to inform her that a copy of the inspection report would be forwarded to her, and Boldt forwarded the report the same day in an email that also stated, "Attached are the estimates and other supporting documents for the structural inspection . . . ." With respect to that email from Boldt, the following exchange

occurred during Forehead's deposition between Forehead and the Hinsons' counsel:

Q. [by the Hinsons' counsel:] What is Exhibit No. 4?

A. [by Forehead:] This is the e-mail that [Boldt] told me that she had sent to me. She called me . . . on the phone, and told me that she had the report, and that she was sending it to me.

Q. Do you recall anything else she told you about the report, and what she was sending you?

A. No.

Q. And when did . . . Boldt send this e-mail to you?

A. December 14th.

Q. And what did . . . Boldt say to you in the text of the e-mail at the top?

A. It says — and I am not sure — I am not sure. Attached are the estimates and other supporting documents for the structural inspection; is that what you're talking about?

Q. Correct.

. . . .

A. Yes, she called me to let me know this was coming.

Q. Okay. And if you go down towards the bottom of the e-mail, it appears that she was actually forwarding you an e-mail from . . . Ram[J]ack?

A. Oh, yeah. Uh-huh.

Q. Okay. And if you look at the bottom of Page 2, it indicates there were nine attachments to the e-mail, correct?

A. It looks like there was, yes.

Q. And then the first of the attachments is actually entitled capital E estimate, correct?

A. On here, yes, on the piece of paper, yes.

Q. Okay. What did you do when you got Exhibit No. 4?

A. Well, first of all, when she called me I called the seller and I said, We have an inspection report back from the agent, . . . Boldt. And we had a conversation. I

don't remember a lot of the conversation other than the fact that we talk about the fact that there was no offer with this.

Q. Okay.

A. It's just an inspection report.

Q. Okay.

A. And [Michael] said he did not want to see it.

Q. Did you forward it to him?

A. No, I did not.

Q. So you didn't even forward this e-mail?

A. I did not forward it to him.

Q. Did you open any of the attachments?

A. I did not open the e-mail.

Q. So based upon this e-mail, you knew that it was a follow-up, or it came after . . . Boldt's client having a structural inspection of the property, correct?

A. Yes.

Q. And you at least read the text of the e-mail, correct?

A. I read the top part, but . . . when she called me I was not at my computer. I was somewhere else. She called me. I talked to her. She said she was sending the report.

Q. Okay. And that indicates right in the sentence there that there was an estimate and other support documents for the structural inspection, correct?

A. Yes.

Q. What's your understanding of what . . . an estimate is?

A. My understanding is that . . . if . . . an e-mail says that there's an estimate on it, that there's a cost involved.

Q. Okay. More basic than that, what is an estimate?

A. An estimate is an estimate. If you have broken window, and someone comes out to look at it, they give you a price to fix it.

. . . .

Q. So here we knew that this estimate came in the context of a follow-up to a structural inspection of the property, correct?

A. Yes.

Q. So from this e-mail without opening the attachment you could tell that that this engineer . . . from Ram[J]ack had provided some cost estimate to do some kind of repair . . . to the property, correct?

A. Yes.

Q. But this Exhibit 4 you did not forward to [Michael] at his request, correct?

A. Yes.

Q. And you did not open it, correct?

A. I did not open it.

Q. Although you knew there was an estimate attached?

A. Yes.

The RamJack report forwarded to Forehead contained the inspector's observation report that read, in pertinent part:

The sever [sic] elevation changes are on the West wall but all the foundation walls have settlement except the SE back corner. Those elevations are showing zeros showing no settling. . . . In a few different room[s] their [sic] are cracks in the drywall most likely from the sever [sic] settling. The front pillar has moved away from the foundation approximately 1' at this time. I have purposed [sic] to install 2 piles to stabilize and possible recovery.

On January 4, 2018, Boldt sent a followup email to Forehead, stating in part:

I sent over an offer for Jones Circle. The buyers are very interested and love the neighborhood and lot. They are willing to take on the work that they feel needs to be done to the property. Mainly the foundation work, replacing the rotted windows, and fixing damaged drywall due to water damage.

Forehead forwarded this email to Michael, stating that she received the email "with the earlier offer for $300,000" and that "[t]he perception by agents and their buyers is that there are problems with the property." Our record does not include

further communications from Forehead after she informed Boldt that the Beans rejected the offer.

(b) Communications With Other
Prospective Buyers' Agents

Several other agents of prospective buyers communicated with Forehead regarding the Beans' property. Forehead received an email on December 4, 2017, from an agent affiliated with Heartland Properties, Inc., reporting that "[i]t seemed as if there had been some settling" and that settling "scared the buyer." An email sent on December 6 by an agent with Nebraska Realty indicated that "[w]indows in family room and basement on the North side of home are a concern of the buyer," and Forehead testified at her deposition that this agent informed Forehead in a subsequent phone call that the potential buyers were concerned that "[t]he trim around the windows [had] come apart, and it look[ed] like . . . water [had] come into the basement around the baseboards." On December 7, a different agent with Nebraska Realty sent an email, noting that the house "[s]eemed a little rough around the edges" in that there was "some decent cracking in the ceiling/walls in the master bedroom" in addition to "wavy floors" and indications of "some settling going on." An agent with NP Dodge emailed Forehead on December 14, describing in part that the home "had some foundational issues/tilt slant in some parts."

(c) Forehead's Observations of Property

At her deposition, Forehead was asked whether she observed any conditions while touring the property. She described the home as "an older home" that she believed was built "[p]rior to 1990." She saw that "[o]ne of the pillars [of the front porch] had moved slightly." When asked if she observed anything of note regarding the windows along the north wall of the property, Forehead answered, "Nothing in particular. It's an older house." She recounted that she "saw settling," but she believed it "typical of houses in that age category [to] have settling

cracks." She recalled that the "floor sloped in the entryway" and also "a little bit in the kitchen." While she remembered that Michael had told her about previous water damage caused by a broken water heater or water softener, Forehead testified that she did not recall seeing any other signs of water intrusion during her tour.

#### (d) Foundation-2-Rooftop Report

In the email Forehead sent to Michael on December 6, 2017, concerning Boldt's request for permission to have an inspection done on the property, she also asked Michael, "Do you have any reports on the basement[?] I know you had an inspection once on the property. Do you have anything that you can share and what do you want me to tell the agent[?]" Forehead acknowledged that Michael provided her the Foundation-2-Rooftop report and that she "glanced at it," recalling "[t]ypical inspection things that needed to be repaired, a few things" that she described as "[n]othing major." When asked whether the Foundation-2-Rooftop report "suggested any followup with engineers or contractors or others," Forehead replied, "To the best of my knowledge, [the report] did not." She recalled that Michael had told her "some things had been done" with respect to the recommendations in the report, but that she did "not know what."

The Hinsons have asserted that the Foundation-2-Rooftop report indicated a number of issues with the property that the report recommended "a licensed Contractor review and repair as deemed necessary." These issues included concerns such as a brick column on the front porch that "slid out at the bottom approximately ½ [inch]"; another brick column that "moved slightly enough to crack the brick and stoop concrete"; the "OSB sub-floor [that] rotted out [1 to 2 feet] along the foundation from water not being able to drain"; several windows that had parts of their "trim, sills, and frames rotted"; rotted areas in the basement subfloor; stains on the block foundation due to moisture damage; and floors in certain areas of the house

that "settled" and "slope." Reply brief for appellants at 7-9. With respect to the property's foundation, the report described the property's "concrete block foundation" from the exterior and interior as "plumb and in good condition" with "no signs of structural movement."

## 2. Summary Judgment

[3] Summary judgment is to be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Wintroub v. Nationstar Mortgage*, 303 Neb. 15, 927 N.W.2d 19 (2019). Under this standard of review, summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled judgment as a matter of law. *Id.* In the summary judgment context, a fact is material only if it would affect the outcome of the case. *Pitts v. Genie Indus.*, 302 Neb. 88, 921 N.W.2d 597 (2019). In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Wintroub v. Nationstar Mortgage, supra*.

### (a) Actual Knowledge Under
### § 76-2417(3)(a)

As part of its April 30, 2020, order, the district court found that for Forehead to be liable as the seller's agent under § 76-2417(3)(a) in this case, she "must have actual knowledge of a material defect." Section 76-2417(3)(a), in pertinent part, provides:

> A licensee acting as a seller's . . . agent owes no duty or obligation to a buyer . . . or a prospective buyer . . . except that a licensee shall disclose in writing to the buyer . . . or prospective buyer . . . *all adverse material facts actually known by the licensee. The adverse material*

*facts may include, but are not limited to, adverse material facts pertaining to*: (i) Any environmental hazards affecting the property which are required by law to be disclosed; (ii) the physical condition of the property; (iii) any material defects in the property; (iv) any material defects in the title to the property; or (v) any material limitation on the client's ability to perform under the terms of the contract.

(Emphasis supplied.) The portion of Neb. Rev. Stat. § 76-2403 (Reissue 2018) applicable here defines an "[a]dverse material fact" as "a fact which . . . significantly affects the desirability or value of the property to a party and is not reasonably ascertainable or known to a party."

[4-6] We determine a statute's meaning based on its text, context, and structure. *Ash Grove Cement Co. v. Nebraska Dept. of Rev.*, 306 Neb. 947, 947 N.W.2d 731 (2020). Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words that are plain, direct, and unambiguous. *Weatherly v. Cochran*, 301 Neb. 426, 918 N.W.2d 868 (2018). The court, in discerning the meaning of a statute, should determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense. *Id.*

[7-8] Our reading of the plain language of §§ 76-2403 and 76-2417(3)(a) informs us that a licensee acting as a seller's agent is required to provide to a buyer or prospective buyer written disclosure of adverse material facts actually known by the licensee. An adverse material fact is a fact which significantly affects the desirability or value of the property to a party and is not reasonably ascertainable or known to that party, and which may include, but is not limited to, a fact pertaining to any environmental hazards affecting the property required by law to be disclosed, the physical condition of the property, any material defects in the property, any material defects in

the title, or any material limitation on the client's ability to perform under the terms of the contract. As applicable here, Forehead was required to provide in writing to the Hinsons any facts actually known by Forehead which would significantly affect the desirability or value of the property and which were not reasonably ascertainable or known by the Hinsons, pertaining to the physical condition of the property or any material defects in the property.

### (b) Propriety of Summary Judgment

The district court determined that "Forehead did not have actual knowledge of a material defect." The court was persuaded by Forehead's testimony that she never opened the email from Boldt containing the estimate and other documents together with Forehead's reported observations of the Beans' property. The court also noted that "[a] couple buyers expressed concern about settling and potential problems with the foundation," but these concerns "did not impute upon Forehead *knowledge* that the home needed extensive repair." (Emphasis in original.)

[9] However, we do not construe §§ 76-2403 and 76-2417(3)(a) as narrowly as the district court. These statutes do not limit Forehead's duty to disclose facts only when she has actual knowledge of the existence of a material defect or only when she has knowledge that a home needs extensive repair. Rather, the statutes contemplate whether Forehead knew of any facts which significantly affected the desirability or value of the property and which were not reasonably ascertainable or known by the Hinsons, pertaining to the physical condition of the property or any material defects in the property. Based on the record before us, a fact finder could conclude that Forehead was aware of such facts.

As we have previously described, Forehead received communications from no fewer than four agents indicating the existence of settling, tilting, or slanting with respect to the foundation. These communications also referenced prospective

buyers who were either dissuaded from giving an offer or gave a lower offer than the listing price set by the Beans because of such concerns. Forehead's communications with Boldt are particularly illustrative, as Boldt first wrote that Starkel's "main concern [was] the foundation" and later sent Forehead an offer of $300,000 for the Beans' property that was substantially lower than the property's listing price of $469,500. Forehead herself noted in an email to Michael that Boldt was the second agent to request permission for a prospective buyer to hire an inspector to examine "the foundation and water issues." In an email accompanying Starkel's $300,000 offer, Boldt noted that Starkel was "willing to take on the work . . . need[ed] to be done," which consisted of "[m]ainly the foundation work" in addition to "replacing the rotted windows[] and fixing damaged drywall." This evidence could support a conclusion that Forehead was aware of, but did not disclose to the Hinsons, facts which significantly affected the desirability or value of the property.

Also, Forehead's deposition testimony that she never opened Boldt's email forwarding the RamJack report or that she "glanced" at the contents of the Foundation-2-Rooftop report and saw "[n]othing major" is not dispositive on the question of Forehead's knowledge of facts pertaining to the physical condition of the property or any material defects affecting the desirability or value of the property. Forehead's receipt of responses and other communications from the various other prospective buyers' agents cannot be discounted. The record demonstrates that Forehead received communications indicating that several prospective buyers, specifically because of the property's foundation, had elected to either not enter offers for the Beans' property or offer a purchase price substantially lower than the property's listing price.

[10] When viewing the evidence in the light most favorable to the Hinsons, the believability of Forehead's claimed lack of knowledge of any facts pertaining to the physical condition of the property or any material defects therein which would

significantly affect the desirability or value of the property to the Hinsons is a matter to be considered by the fact finder. When the testimony of the parties is in conflict and credibility is a factor, summary judgment is not proper. *Blome v. Hottell*, 200 Neb. 528, 264 N.W.2d 424 (1978). And contrary to the dissent's characterization, we do not view the sole issue to be whether Forehead was required to disclose the contents of the RamJack report; rather, the issue is whether Forehead had actual knowledge of adverse material facts based upon all the information available to her, which knowledge she was obligated to disclose. We find that this is a question of fact. Because we conclude the plain language of §§ 76-2403 and 76-2417(3)(a) as applied to the evidence in the record before us raises a genuine issue as to material facts, summary judgment was not appropriate.

However, there is another factor that must be considered. As previously noted, an adverse material fact is a fact that is "not reasonably ascertainable or known to a party." § 76-2403. Thus, we must determine whether there is a material issue of fact as to whether the alleged adverse material facts described above regarding the physical condition of the property or material defects in the property were reasonably ascertainable or known by the Hinsons. In doing so, we consider whether the Hinsons' retention of others to conduct a home inspection on their behalf made those alleged adverse material facts reasonably ascertainable to them. We conclude that we cannot say, as a matter of law, that by obtaining their own home inspection, the Hinsons made those alleged adverse material facts reasonably ascertainable to them. We have found no authority stating that prospective buyers who obtain their own home inspection have now made any alleged adverse material facts reasonably ascertainable to them, as a matter of law. We conclude that such circumstances must be considered by the fact finder on a case-by-case basis.

Given our conclusion that summary judgment was not appropriate, it is unnecessary for us to consider the Hinsons'

suggestion that § 76-2417(3)(a) should be construed based upon the Nebraska Supreme Court's interpretation of Neb. Rev. Stat. § 81-885.24(14) (Reissue 1981) in *Hancock v. State ex rel. Real Estate Comm.*, 213 Neb. 807, 331 N.W.2d 526 (1983) (§ 81-885.24(14), penal in nature, deals with revocation or suspension of real estate license when licensee is found guilty of negotiating sale or listing real estate directly with owner if he or she knows that owner already has listing contract with another broker; court determined person knows of some fact or condition when person has actual knowledge of fact or condition or has actual knowledge of facts that would cause reasonably prudent person to believe such fact or condition exists).

We also note that Forehead and Ambassador argue that while the Hinsons claim there was actual knowledge under § 76-2417(3)(a), they "remain silent on the duties under . . . §76-2,120." Brief for appellees at 18. Section 76-2,120(9) states that a "person representing a principal in the transaction shall not be liable . . . for any error, inaccuracy, or omission of any information in a disclosure statement unless that person has knowledge of the error, inaccuracy, or omission on the part of the seller." Forehead and Ambassador argue that "[i]t cannot be said that [they] obtained the requisite actual knowledge necessary under only one of these statutes." Brief for appellees at 18. We disagree. Our reading of §§ 76-2,120 and 76-2417(3)(a) does not persuade us that knowledge of errors, inaccuracies, or omissions in the seller's disclosure statement that would trigger liability under § 76-2,120 is necessarily equivalent to knowledge of adverse material facts that would trigger liability under § 76-2417(3)(a) such that a seller's agent could not be liable under one statute without also being liable under the other.

[11] Forehead and Ambassador also argue that regardless of the issue of actual knowledge, the Hinsons' argument is nevertheless moot on the basis that they cannot prove causation or damages against them. However, the district court did

not reach the issue of causation, let alone damages, in its order granting summary judgment. We therefore decline to consider that argument. An appellate court will not consider an issue on appeal that was not passed upon by the trial court. *Thomas v. Peterson*, 307 Neb. 89, 948 N.W.2d 698 (2020).

Viewing the entire record before us in a light most favorable to the Hinsons and giving them the benefit of all reasonable inferences, we agree with the Hinsons that a genuine issue of material fact exists in this case. Specifically, that issue of material fact is whether Forehead had actual knowledge of adverse material facts, meaning her actual knowledge of facts, which would significantly affect the desirability or value of the property and which were not reasonably ascertainable or known by the Hinsons, pertaining to the physical condition of the property or any material defects in the property. Therefore, the district court's grant of summary judgment in favor of Forehead and Ambassador was not appropriate.

## VI. CONCLUSION

For the reasons set forth above, we reverse the district court's order granting summary judgment in favor of Forehead and Ambassador and remand the cause for further proceedings on the Hinsons' claim that Forehead and Ambassador breached a duty to the Hinsons under § 76-2417(3)(a).

Reversed and remanded for
further proceedings.

Welch, Judge, dissenting.

I respectfully dissent from the majority opinion because I believe the district court properly granted the appellees' motion for summary judgment on this record. The sole issue in this case is whether a residential property seller's agent was required to disclose to the appellants the contents of a report the seller's agent received from a previous prospective buyer's contractor. Here, the previous prospective buyer's contractor, RamJack, issued a report which stated that the source of

certain cracks in the residential structure's foundation and dry-wall was "most likely from the sever [sic] settling." The report further stated: "The front pillar has moved away from the foundation approximately 1' at this time. I have purposed [sic] to install 2 piles to stabilize and possible recovery."

As to this same cracking, the appellants retained their own contractor to observe and ascertain the cause and origin of the cracking. The appellants' contractor, a licensed engineer, opined: "Nothing discussed . . . would indicate that there are significant structural issues or damage to the residence." After receiving that report, the appellants purchased the residential property only to later discover the contents of the prior RamJack report and sue the appellees for failing to disclose it. The appellants argue that the appellees were obligated to disclose the RamJack report under Neb. Rev. Stat. § 76-2417(3)(a) (Reissue 2018).

As the majority opinion notes, § 76-2417(3)(a) explicitly provides that a seller's agent owes no duty or obligation to a buyer or prospective buyer except to disclose in writing "all adverse material facts actually known by the licensee." As relevant to this case, those may include adverse material facts pertaining to "the physical condition of the property," § 76-2417(3)(a)(ii), and "any material defects in the property," § 76-2417(3)(1)(iii). "Adverse material fact" is defined by statute as

> a fact which (1) significantly affects the desirability or value of the property to a party and is not reasonably ascertainable or known to a party or (2) establishes a reasonable belief that another party will not be able to, or does not intend to, complete that party's obligations under a contract creating an interest in real property.

Neb. Rev. Stat. § 76-2403 (Reissue 2018).

The majority objects to the dissent's narrow characterization of the issue in this case as the appellees' failure to disclose the contents of the RamJack report. Instead, the majority frames the issue more broadly, stating, "[T]he issue is

whether Forehead had actual knowledge of adverse material facts based upon all the information available to her . . . ." But in my view, the issue was framed by the appellants themselves in their complaint.

In the "Facts" section of their complaint, the appellants assert the appellees' violation related to failing to disclose "significant structural issues with the [p]roperty" which the appellants alleged the appellees learned from the RamJack report. Although the appellants never explicitly state in their complaint the specific nature of the "significant structural issues," the appellants direct the court to the RamJack report, which provides that the cracking is "most likely from the sever [sic] settling" and states, "I have purposed [sic] to install 2 piles to stabilize and possible recovery." The appellants then allege that "[d]espite having received the [RamJack] report from . . . Starkel, neither the Beans nor . . . Forehead disclosed the information contained in the [RamJack] Report to prospective buyers of the Property, including the Hinsons." Then, again, in their fifth theory of recovery, the appellants claim the appellees violated § 76-2417(3), alleging, "Forehead and [Ambassador] knew or should have known that there were structural issues with respect to the Property based upon the [RamJack] report that . . . Starkel provided to . . . Forehead." As such, the specific nature of that portion of the complaint relevant to this appeal is that the "significant structural issues" the appellants claim existed here and which the appellees failed to disclose in violation of § 76-2417(3) were the information contained within the RamJack report.

As to that report, the explicit terms used by RamJack provided that the "sever [sic]" settling was "most likely" the cause of the cracking and unquestionably demonstrate the expression of an opinion on the condition of the property. Similarly, the appellants' own contractor, a licensed engineer, issued his own opinion that those same cracks did not pose a significant structural issue to the home. The question becomes whether the seller's agent was legally obligated to disclose the RamJack

opinion to the appellants. As a matter of law, I believe the seller's agent was not. The only duty owed by a seller's agent to the buyer here is to disclose adverse material facts, not opinions. The only fact I see in this record is the fact that there was cracking in the foundation and drywall, which cracking was reasonably ascertainable and known by everyone involved. Whether that cracking was caused by settling of the home, whether the settling was "severe," and whether any severe settling amounted to a material defect in the property were matters of opinion here, not fact. The majority holds that whether all information available to the appellees triggered a statutory obligation of disclosure constitutes a factual question which must be resolved by the trier of fact and should not properly be resolved through summary judgment. I believe, on this record, that the only fact requiring disclosure was that cracking was present and that this patent condition, known to all, was open to interpretation as to its cause or origin. In my view, subjecting a seller's agent to potential liability here on the basis that the agent failed to disclose the contents of RamJack's opinion on this record would open the door to requiring a seller's agent, out of an abundance of caution, to discose all opinions obtained or received in connection with the sales process. At least on this record, when the report contains language which provides the condition "most likely" relates to what the contractor opines to be a material structural problem, and where objective evidence of a potential material problem is open, obvious, and known by all, as a matter of law, I do not see this as being consistent with the statutory construct requiring disclosure.